May it please the Court, my name is Andrews Johnson. I'm here representing the Petitioner, Mr. Li, in this case. How does he pronounce his name, sir? Li. Li. Oh, I see. I can pronounce the first name, Your Honor, but I'm not sure I'd do very good on that one. This is a case that involves a demonstration and subsequent arrest that occurred in China regarding employee wages. This case is before this Court based on a credibility finding that both the immigration judge and the Board of Immigration found with regard to certain aspects of the Petitioner's testimony. So how do you get around the Enbridge credibility finding? Well, I think that I believe that in the cases, the certain situations that were cited, I don't think there is an inconsistency. For example, the medical record that he presented, which indicated that he had, in fact, gone to a diagnosis which was received two days after he first said he went to the hospital, he testified that he, in fact, went to the hospital, received some medications, went home, came back two days later, and then at that point received a diagnosis. He indicated he did not stay in the hospital. And certainly I think that the judge simply found, and the Board found, that he simply was not being truthful with regard to his hospital treatment, when, in fact, I think he explained plausibly what happened with regard to the date dispute. Didn't he omit any mention whatsoever of going to the hospital in his asylum application? He did not mention treatment at a hospital in his original declaration. However, he did submit the medical record prior to his asylum interview. So this is not a situation where he's in trial or in individual hearing and brings up the fact that he received treatment. This was very early on in his application. I suppose it would have been nice if perhaps he had amended his declaration. Not just nice, but you'd expect somebody who had to go to the hospital for a couple of days would have put it in the application. Right. And the Petitioner basically said, I forgot, and I will submit that's not a terribly articulate way of explaining it. But I don't think it was a situation. One of the fears in having omissions is that he's just suddenly making it up or enhancing the story after the fact.  And so I don't think it was a matter of enhancing his case later, since it was done  for review by the asylum interviewer as well as the individual hearing. And while, as I say, it would be preferable if he had placed it originally in his declaration, he may have – he didn't. But at the same time, I don't think it was a matter of enhancing his case later, since it was done so quickly after he wrote the declaration that he submitted the medical record for review by the asylum interviewer as well as to the immigration judge. In addition, there's a – there was a testimony with regard to – or the inconsistencies with regard to his employment. Unfortunately for him, I believe there was a business card that he was able to produce to show that he worked at this place, but nothing else. This Court has held in the past that employment records, certainly from China, are difficult to get, especially in situations where you are disputing wages. And so I think that he was able to, you know, explain with regard to his employment history that the fact he did work there, he had the business card, it would have been, again, something impossible to get to show that he had been terminated or that he had, in fact, even worked there to get that from the company. I think that there was another credibility issue with regard to his father's letter, although I don't think that is, again, an inconsistency. He produced a letter from his father who had said, don't come back, you will be arrested by the police who are looking for you. He was basically asked, when did you receive this letter, despite the fact that he also produced with the letter the envelope that the letter came in. The fact that he didn't know when he got the letter, I don't think is an inconsistency since he produced the envelope which the letter came in, although the court, the immigration judge felt that that somehow lessened the authenticity of the letter itself. I just simply would submit that he had produced the evidence to authenticate the letter, irregardless of the fact that he could not remember, without seeing the envelope, exactly when he personally had received the letter and submitted it to the asylum office. I think also there is an issue with regard to having broken tooth. He had also indicated he had blood in his mouth. He had blood on his shirt when he went, when he was released from custody. However, the hospital record did not indicate there was any blood on his shirt. However, the Petitioner didn't go to the hospital until the next day, so obviously there would be nothing to show that he, in fact, had blood on his shirt because he wasn't wearing the same shirt. Now, there may be a problem with respect to tooth. He says he broke a tooth and then I.J. says, well, show me where it's broken and so on. What do we do with the fact that the BIA, in affirming the adverse credibility finding, says nothing about the tooth? Does that mean we ignore that as supporting the adverse credibility finding? Do we include it just under the umbrella of adverse credibility finding because it is in the record? What do we do with it? I think that in looking at the BIA's decision, we're also, you're also allowed to look at the underlying decision from the immigration judge. Certainly that would be included within that in terms of her deference. So you think you have to deal with that, with the tooth problem? I would expect you to, yes. Okay. And with regard to the, so I think overall, I mean, we have here a detailed declaration that the Petitioner had submitted. I think his testimony in general was consistent. These certain, these inconsistencies, while, as I say, in some cases could have been better articulated by the Petitioner, were not, you know, were here on the record, which I think he has left us with a plausible explanation as to what, as to why there is a perceived inconsistency. I see you're down to about two and a half minutes. Would you like to save some time? Yes. Thank you, Mr. Johnson. Good morning. Good morning, Your Honors. Anne Wellhoff for respondent, Attorney General Holder. May it please the Court, Your Honors, this case, as we've been discussing, turns on the credibility of the Petitioner in this case. And the immigration judge and the board held that he was not credible. This case is subject to the extremely deferential standard post-Real ID Act, which permits the agency to base its adverse credibility finding on the totality of the circumstances. In this case, the agency weighed the testimony, the documentary evidence, and made common sense conclusions about the plausibility of the evidence, and concluded that the story given was not credible, was not consistent internally between testimony at one point in the proceeding and another. It was not consistent with documentary evidence. And the story didn't make sense in many ways. And the immigration judge and the board pointed all those out very clearly, which provide very clear rationale underlying the adverse credibility determination. It's the Petitioner's job to tell this court that the evidence absolutely compels a contrary conclusion. And Petitioner has not done so in this case. In fact, on brief and in argument this morning, really all that's occurred is additional explanations for why the testimony was inconsistent. An acknowledgment of inconsistencies and more explanations. The immigration judge and the board rejected those explanations. And that is extremely, hard for this Petitioner to point to any evidence that would compel a believability finding. There's simply nothing there. Yeah. We see, of course, adverse credibility findings all the time. And we don't see them quite as frequently as the IJs do, because that's sort of their steady diet. But we see a lot of these. It strikes me that the evidence in support of the adverse credibility finding is fairly thin. A couple of days' delay, the difference between a broken tooth and a chipped tooth, some discrepancy in dates of employment, that's about it. Your Honor, well, respectfully, I would disagree that the evidence is thin. I believe that the difference is thin. Thin doesn't mean you lose, but it strikes me as thin. Your Honor, I believe that specific cogent reasons were, in fact, pointed out. And I'd like to walk the Court through some of those. For example, and again, you understand that the agency is entitled to take these in totality and weigh the credibility. Maybe in isolation, any one particular item would not suffice. But in the totality, and then when you factor in the plausibility, the agency was well within its authority and discretion in rejecting his credibility. The dates, let's look at those for the hospital treatment. First of all, most glaringly, there's no mention that this Petitioner received hospital treatment in his asylum application. That's pretty — that's inexplicable. And the offered explanation was, I forgot. The immigration judge acted reasonably in the agency in rejecting that as an explanation. It doesn't make sense that you would forget something that important. To the extent he does talk about going to the hospital, he tells us at least two different dates. First, he tells us he went to the hospital on May 9th, the day that he got out of prison. Later, he proffers a document from the hospital and the date's May 11th. When asked if he's off two days, does that mean he didn't go to the hospital or what does that mean? Well, it means that the hearing took place in 2008. If he went to the hospital sometime in 2005, I mean, he may have gotten two days. But the different dates, he was very specific on the date of the protest and how long he was in prison, and he was very specific that the day he was released from prison, he went to the hospital. That's not what the document says. His proffered explanation was, oh, well, actually, I went on both days. I went on the 9th, and they told — they gave me prescription medication to treat my injuries and told me to come back in two days to get my diagnosis. The immigration judge reasonably said that makes no sense. Why would they medicate you and send you on your way without telling you what's wrong with you? That — the agency rejected that explanation, and they are well within their purview to do so. His injuries, he talked about blood. There was blood on his body, and his shirt was blood. There's blood discussion in both his asylum application and in his testimony. When you look at the medical record, there's no mention of any — or, well, there's swelling, but there's no lacerations or blood mentioned at all. You know, I don't think — we can talk about the missing tooth, but there's, you know, there's plenty of other things without the missing tooth. His employment history, he tells us that he started working for another company within days of being let go from U.S. MAC, within days of that. And he initially tells the immigration judge he was at that place of employment with Alpine for three years. Later, when he's cross-examined and we try to pin him down — and the department tries to pin him down to his dates, at one point, his testimony goes down to having worked there under two years. When the department points out that his asylum application offered a third version of how long he worked at Alpine Electronics, he came up with an explanation. He said, well, that one's correct, but the first few months were actually probationary, so that's why I didn't tell you about it here in testimony. The department asked him, well, then why'd you tell it on your asylum application? No explanation. The immigration judge didn't — rejected that explanation. There's the — there's the implausibility of the overall story that throughout this entire scenario, petitioners stated he was in charge of the labor protest, that he was leading it, he organized it. He spoke to the police at the event. He was the one that was the representative. He used that word a lot. He then went to the Labor Bureau and met on behalf of all these employees. He absolutely held himself out as a leader, yet he tells us that he fears going back because the only reason that the government knows he led that protest was because his friend told on him after he left. The agency said that's not very plausible. That doesn't make sense. You've told us throughout your testimony and throughout your asylum application that you were acting in a representative capacity. It was clear when you were dealing with the employer and the government, they were dealing with you as the leader. So that part of his story just didn't wash with the agency. Again, after the Real ID Act, the agency's hands are untied as far as what they can point to to say this story isn't credible. And they may look at the totality of the circumstances and say on totality, does this story make sense? Was it credible? And if the agency rejects it as credible, which it did here, it's Petitioner's job to point to evidence that would compel a contrary conclusion. And Petitioner has not done so in this case. Thank you. Thank you, Mr. Johnson. You've got about two and a half minutes left. I know that we've discussed the testimony and some of the inconsistencies, apparent inconsistencies, but I think overall, one looks at the entire record, the document, the medical record, as well as the father's letter. We're never called into question with regard to their authenticity. They're not fraudulent. They're not made up. It simply had to do with what Petitioner knew about the specifics of the document. Those documents show that this person was, the Petitioner was beaten, that he received medical treatment, that there are police who are looking for him if he were to return to China. And so I think that that helps to lend a plausibility to the entire story of what happened to him, that he, in fact, was in a protest, was arrested, was beaten, was treated, and now cannot return to China because of that. And so we can look at the little things as to when he received the father's letter or if he went to the hospital on the 9th or the 11th or and the 11th. The fact of the matter is he did go to the hospital, and they are looking for him. And I think that that overall, I think picking apart certain aspects of it, I think belies the fact that this is a man who was persecuted in China. And I think we need to, I think the Court should take that into account when considering whether or not we, you know, he should be deported and sent back to China to face possibly more persecution. So I think that one needs to really look at that aspect of it. I don't think that some of the inconsistencies would lead to the should somebody discard everything else that was presented in support of his case. Thank you, Mr. Tenton. Ms. Wellhoff, thank you, too. The case just argued is submitted.
judges: Silverman, Fletcher, Bybee